**UNITED STATES  DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**DWAIN HOFFMAN,**

                    **Plaintiff,**

**vs.**                                                    **Case No.   8:04-cv-1777-T-MSS**

**COMMISSIONER OF SOCIAL SECURITY,**

                    **Defendant.**
_____/

## ORDER

Plaintiff brings this action pursuant to the Social Security Act ("the Act"), as amended, Title 42, United States Code, §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying claims for disability insurance benefits and supplemental security income.[1]

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge ("ALJ"), the exhibits filed, the administrative record, and the pleadings and memoranda submitted by the parties in this case.

**I.     BACKGROUND**

A.   Procedural History

Plaintiff applied for disability insurance benefits and supplemental security income payments on February 15, 2001, alleging an onset date of June 14, 2000.  (T. 21, 66).  The

_____

[1]  The matter has been referred to the Undersigned by the District Court for consideration and a Report and Recommendation.  See Local Rules 6.01(b), M.D. Fla.

claim was denied initially and on reconsideration and a request for hearing was timely filed. (T. 21).  A hearing was held on March 21, 2002.  (T. 21).  The ALJ denied benefits in a decision dated May 28, 2002.  (T. 21-31).  On July 7, 2004, the Appeals Council denied review of the ALJ decision making the ALJ's decision the final decision of the Commissioner.  (T. 4-6).  On August 3, 2004, Plaintiff filed this action for review.  (Dkt. 1).

B.  Work History and Findings Summary

Plaintiff's medical history is set forth in the ALJ's decision.  By way of summary, Plaintiff claims to be disabled due to problems with his left knee, back pain and anxiety.  (T. 22).  Plaintiff claims that on the alleged onset date he re-injured his left knee when he slipped on wet grass while working.  (T. 23).

In the ALJ's decision, the ALJ found that Plaintiff met the non-disability requirements set forth in Section 216(i) of the Act and was insured for benefits through the date of the decision.  (T. 22).  Plaintiff had not engaged in substantial gainful activity since his alleged onset date.  (T. 22).  The ALJ determined that, based upon the medical evidence contained in the record, Plaintiff had post-traumatic knee osteoarthritis, a severe impairment within the meaning of the Regulations.  (T. 24).  The ALJ determined that Plaintiff's knee impairment did not meet or medically equal one of the impairments listed in Appendix 1, Subpart P of Social Security Administration Regulation No. 4.  (T. 24).  The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to lift ten pounds occasionally, with a sit/stand option, allowing for occasional use of a cane for walking, in simple, routine repetitive tasks.  (T. 27).  The ALJ considered Plaintiff's subjective complaints but found that they were not totally credible.  (T. 30).  The ALJ next determined that Plaintiff could not perform his past relevant work.  (T. 27).  The ALJ found, however, that Plaintiff could

perform other work activity pursuant to the Vocational Expert's ("VE") testimony.  (T. 29). As such, Plaintiff was not disabled under the Act.

## II.      STANDARD OF REVIEW

In an action for judicial review, the reviewing court must affirm the decision of the Commissioner if it is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  If there is substantial evidence to support the Commissioner's findings, this Court may not decide the facts anew or substitute its judgment as to the weight of the evidence for that of the Commissioner.  See Goodley v. Harris, 608 F.2d 234, 236 (5th Cir. 1979).

No similar presumption of validity attaches to the Commissioner's legal conclusions; rather the Court reviews the application of law de novo.  See Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993).  If an error of law was committed by the Commissioner, the case must be remanded to the Commissioner for application of the correct legal standard.  See McDaniel v. Bowen, 800 F.2d 1026, 1029-1030 (11th Cir. 1986); Smith v. Heckler, 707 F.2d 1284, 1285 (11th Cir. 1983).  If the reviewing court is unable to determine from the Commissioner's decision that the proper legal standards were applied, then a remand to the Commissioner for clarification is required.  See Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987).

Plaintiff contends that the decision of the Commissioner must be reversed for the following reasons: (1) the ALJ improperly evaluated Plaintiff's subjective complaints; (2) the ALJ failed fully to investigate Plaintiff's limitations; (3) the ALJ did not pose a proper

3

hypothetical to the VE; and (4) the ALJ should have credited the worker's compensation vocational consultant over the Vocational Expert ("VE").

For the reasons that follow, the Court **AFFIRMS** the decision of the Commissioner.

## III.    DISCUSSION

### A.    WHETHER THE ALJ PROPERLY EVAULATED PLAINTIFF'S SUBJECTIVE COMPLAINTS OF PAIN

Plaintiff argues that the ALJ erred in discounting Plaintiff's credibility based on mischaracterizations of the evidence and should not have discounted Plaintiff's complaints based on a failure to explore all modalities of treatment or to lose weight.    The Commissioner responds that the medical evidence as well as Plaintiff's activities do not support Plaintiff's subjective complaints and, thus, the ALJ properly discounted Plaintiff's subjective complaints.

The standard for evaluating subjective evidence of pain in disability cases requires the ALJ to consider a claimant's subjective pain testimony if there is (a) evidence of an underlying medical condition and (b) either (1) objective medical evidence to confirm the severity of the alleged pain or (2) that the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.  Mason v. Bowen, 791 F.2d 1460, 1462 (11th Cir. 1986)(emphasis added).  This standard also applies to other subjective complaints.  Holt v. Sullivan, 921 F.2d 1221 (11th Cir. 1991).

Under the alternate prong of the pain standard, subjective pain testimony which is supported by clinical evidence of a condition that can reasonably be expected to produce the symptoms of which Plaintiff complains is itself sufficient to sustain a finding of disability. This prong requires the ALJ to evaluate the credibility of a claimant's testimony as to pain

and to articulate a reasonable basis for rejecting the testimony if it is rejected.  Sewell v. Bowen, 792 F.2d 1065, 1068 (11th Cir. 1986).  If the ALJ rejects a claimant's testimony regarding complaints of pain, he must articulate "explicit and adequate reasons" for doing so.  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995).  Further, the articulated reasons for discrediting a claimant's testimony must be supported by substantial evidence.  Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987).  Failure to articulate reasons for rejecting a claimant's testimony requires that the testimony be accepted as true as a matter of law.  Foote, 67 F.3d at 1562.  The same is true if the articulated reasons for discrediting the testimony are not supported by substantial evidence.  Hale, 831 F.2d at 1012.

In reviewing the ALJ's decision, the Court must first determine as a matter of law whether the ALJ applied the correct legal standard in evaluating Plaintiff's complaints of pain and other subjective symptoms.  See Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987).  The Court may not disturb the ALJ's credibility finding if it is clearly articulated and supported by substantial evidence.  See Foote, 67 F.3d at 1562.  In this proceeding, the ALJ, in conducting the pain analysis, concluded that he was required to consider Plaintiff's complaints because the "regulatory requirements for the presence of a medically determinable physical impairment which could reasonably be expected to produce the pain or other symptoms alleged, are satisfied."  (T. 26).  However, the ALJ found Plaintiff's allegations regarding his limitations were not totally credible.  (T. 30).  As required, he articulated a basis for doing so.

The ALJ recognized that Plaintiff testified that he had trouble reading the newspaper, could not balance a checkbook but could do basic arithmetic, and was discharged from the military because he was incapable of understanding their requirements.  (T. 26).  Plaintiff

5

did pass a written driver's test.  Plaintiff estimated that he could not lift even 10 pounds, could only stand up for 5-10 minutes and walk for a block.  According to Plaintiff, he used a cane to go up stairs but sometimes forgot it.  Plaintiff stated that he could not sit long enough to do sedentary work.  Plaintiff applied for fast food work but was not hired.  Plaintiff admitted, however, that he swims twice a week, goes to the movies and drives 200-250 miles a week.  He can take care of his own hygiene needs and does household chores such as dusting and vacuuming, although he does them slowly.  (T. 26).

The ALJ only credited Plaintiff's testimony to the extent that he found Plaintiff may be limited to do simple, routine jobs; that symptoms may relegate Plaintiff to using a cane for stability when walking; and that Plaintiff may require the option to change positions at will.  (T. 26-27).  In discrediting the remainder of Plaintiff's allegations, the ALJ noted that Plaintiff's physicians found him capable of performing sedentary work.  (T. 25).  The ALJ stated that Dr. Freid found Plaintiff was able to handle funds and found him "to be no less than low normal in intelligence."  (T. 26).   The ALJ noted that Plaintiff reported few, if any, major side-effects from his Celebrex medication.  (T. 27).  The ALJ stated that Plaintiff "had not explored all modalities of treatment for the condition" in that "he has not had all of the prescribed additional surgery, transneuronal or dorsal stimulation, morphine pump implantation, regular and formal pain clinic management pain physiotherapy."  (T. 27).  Further, the ALJ noted that Plaintiff had not lost any weight due to pain or depression but, rather, had actually gained weight.  The ALJ noted that at home Plaintiff was able to do household chores, swim, drive 800 miles alone and handle his own needs.  Finally, the ALJ noted that Plaintiff had one diagnosis of factitious disorder.  (T. 27).

Plaintiff argues that the ALJ's discrediting of Plaintiff's testimony was largely based

6

on mischaracterizations of the evidence.  Plaintiff argues that the ALJ erred in discounting Plaintiff's allegations regarding his mental capabilities by stating that Dr. Freid found Plaintiff to be "no less than low normal" in intelligence when Dr. Freid actually stated that Plaintiff functioned in the "low average to below average" range.  (Dkt. 16 at p. 9).   What Plaintiff fails to note is that the ALJ also referenced that "except for the near illiteracy, none of the visceral and psychiatric conditions seem to have resulted in severe long-term consequences, and the applicant did not mention them at the hearing."  (T. 24).   Further, the ALJ recognized that Plaintiff "may well have to do only simple, routine jobs in view of his claimed minimal ability to read or write, and so assumed when questioning the vocational expert. . . ."  (T. 26).  The ALJ included in his hypothetical to the VE that Plaintiff had "a moderate concentration deficit, which would preclude all complex or detailed job tasks, but would permit simple, routine, repetitive job tasks."  (T. 529).  Accordingly, the ALJ did consider Plaintiff's mental capabilities and the reference that Dr. Freid found Plaintiff to be functioning in the low average range, as opposed to the low to below average range, was harmless error.

Plaintiff also argues that the ALJ made the "outrageous finding" that Plaintiff had been diagnosed with factitious disorder.  (Dkt. 16 at p.11).  The Commissioner responds that the record does include reference to factitious disorder.   (Dkt. 18 at 11).   The Commissioner is correct.  There is a record in the evidence from a hospital stay which states that Plaintiff's reported "left side numbness, weakness could be due to either his migraine headache, situational stress, or even factitious disorder."  (T. 146).  While he cited this record, the ALJ specifically noted that the finding was "probably not conclusive."  (T. 27).

Specifically, when evaluating Plaintiff's subjective complaints, the ALJ stated, "[a]lthough probably not conclusive in the face of genuine patellar damage, the undersigned also notes one diagnosis of "factitious disorder" in one of the other hospital visits." (T.27). Ultimately, the ALJ gave Plaintiff "the benefit of every reasonable uncertainty" and found that Plaintiff's symptoms as alleged do require a cane for stability when walking and require that he be able to change positions at will. (T. 27). Accordingly, he did not place undue reliance on the probable diagnosis of factitious disorder.

Plaintiff argues further that the ALJ should not have taken into account Plaintiff's weight gain in evaluating Plaintiff's subjective complaints. Plaintiff notes that no physician ever prescribed weight loss. As noted by the Commissioner, however, the ALJ did not state that weight loss was a prescribed treatment that Plaintiff failed to follow. Rather, the ALJ simply noted that Plaintiff had not lost any weight as a result of his alleged pain. (T. 27). This observation is not improper and was factually consistent with the record evidence.

Next, the ALJ noted that Plaintiff had few side effects from his Celebrex medication and had not explored all modalities of treatment for his condition, specifically the prescribed additional surgery. On October 27, 2000, Dr. Fiore performed a left knee arthroscopic debridement of damaged tissue. (T. 471). The doctor found a left knee lateral meniscus marginal tear and performed a left knee partial lateral menisectomy and a left knee abrasion arthroplasty of the medial compartment. (T. 472). After the surgery, Dr. Fiore directed Plaintiff not to work for about three weeks, but opined that he was recovering uneventfully, was restricted to sedentary work, and should continue physical therapy three times a week for four weeks on November 27, 2000. (T. 184-186). In January 2001, Dr. Fiore noted that Plaintiff was able to walk without a limp, noted that according to Plaintiff, Vioxx significantly

8

improved his symptoms, and noted that Plaintiff was still restricted to sedentary work.  (T. 183).  Dr. Fiore noted that Plaintiff was at risk for requiring a total joint replacement, or total knee replacement.  (T. 183, 480).  Dr. Fiore noted that Plaintiff was still restricted to sedentary work in April 2001.  (T. 182).  In July 2001, the last visit Dr. Fiore had with Plaintiff, Dr. Fiore noted that Plaintiff "is able to perform activities of daily living with the use of an ACL brace," and he continued Plaintiff on a sedentary work restriction although he noted that Plaintiff had not found a job since his last accident.  (T. 331).  Dr. Fiore noted that Plaintiff had good range of motion of the left knee.  Dr. Fiore continued Plaintiff on Celebrex as an anti-inflammatory.  (T. 331).

Plaintiff next contends that the ALJ erred in discrediting the Plaintiff on grounds that he had not availed himself of all prescribed treatment.  The Court finds on this record that knee replacement surgery was not prescribed treatment.   Plaintiff contends that his physicians opined that further reconstructive surgery would be impossible.  As Plaintiff explains, the September 7, 1999, record of treating orthopedic surgeon Dr. Cherry, assessed Plaintiff with "significant degenerative arthritis, medial compartment precluding any type of anterior cruciate ligament reconstructive procedure."  (T. 207).  However, Dr. Cherry also opined on that same date that Plaintiff "will need total knee arthroplasty or at least unicompartmental arthroplasty at some point in the future probably within the next four to five years."  (T. 207).  Approximately one month later, Dr. Fiore performed his left knee arthroscopic procedure on Plaintiff.   Following that procedure, Dr. Fiore noted that Plaintiff would eventually need a total knee replacement.

Plaintiff also points to the records of Dr. Baker, a one time examining physician, who opined in 1999 that "it is very likely that this man will eventually come to a total knee

9

replacement, but he deserves at least one more arthroscopic procedure, because of his age." (T. 323).   Similarly, Dr. Simon, another treating orthopedic surgeon, stated on October 3, 2000, "we warned the patient about having a total knee replacement at this age. He is probably going to have several revisions, but he does have severe tricompartmental arthritis."  (T. 187).   Dr. Simon goes on to state that "in preparation for a total knee replacement, which he is definitely going to need, he should need a scope for debridement and removal of the screws.  This was discussed with the patient, this will be the first stage." (T. 187).  Approximately three weeks later, Plaintiff had the debridement scope performed by Dr. Fiore.  These notes do not affirmatively state that Plaintiff is too young for a total knee replacement, as stated by Plaintiff.  They do indicate that Plaintiff will need knee replacement at some point in the future.

Further, the Court did not locate any records regarding the other mentioned "modalities" of transneuronal or dorsal stimulation, morphine pump implantation, regular and formal pain clinic management pain physiotherapy referenced by the ALJ.  There is no record evidence that any physician told Plaintiff to have a procedure that Plaintiff subsequently refused to have.  Accordingly, the ALJ could not properly discount Plaintiff's subjective complaints on the basis that he failed to follow prescribed treatment.  See Seals v. Barnhart, 308 F. Supp. 2d 1241, 1250 (N.D. Ala. 2004)(stating that the first step in a case involving an alleged failure to follow prescribed treatment is to determine whether a certain course of treatment was actually prescribed).

Notwithstanding the above, the ALJ provided other adequate reasons to discount Plaintiff's subjective complaints that are supported by substantial evidence.  First, the ALJ recognized that Plaintiff's treating physicians opined that Plaintiff could perform more

strenuous activity than Plaintiff alleged.  As noted above, after Plaintiff's October surgery, Dr. Fiore opined that Plaintiff could perform sedentary work after a three week break from all work.  During Plaintiff's last documented visit with Dr. Fiore, the doctor found that Plaintiff was able to perform activities of daily living with the use of an ACL brace.

Further, the ALJ recognized that Plaintiff could perform activities which do not appear to correspond with Plaintiff's asserted inability to work.  Specifically, Plaintiff testified that he swims twice a week, drives 200-250 miles a week, is able to perform household chores although at a slow pace, and attends the movies where he has to get up half way through the show to stretch.  (T. 26-27, 525).

In addition, the records indicate that at the time of the May 2002 ALJ decision, Plaintiff had not seen a doctor for his knee since his July 2001 follow up visit with Dr. Fiore in which Dr. Fiore opined that Plaintiff had good range of motion of the left knee, was able to perform activities of daily living, sedentary work, and continued on Celebrex for inflammation.

Accordingly, the Court finds that the ALJ's discrediting of Plaintiff's subjective complaints was supported by substantial evidence.

**B.    WHETHER THE ALJ FULLY INVESTIGATED PLAINTIFF'S LIMITATIONS**

Plaintiff argues next that the ALJ should have more fully investigated Plaintiff's I.Q. in light of the indication that he was functioning with a limited I.Q.  Specifically, Plaintiff argues that the ALJ should have sent Plaintiff for an I.Q. test to evaluate Plaintiff's verbal and performance I.Q.  Plaintiff also argues that the ALJ should have more fully investigated whether Plaintiff needed his cane for standing in addition to walking.

The ALJ has a duty to evaluate a claimant's entitlement to disability benefits based

11

on a complete and comprehensive medical record.  See 20 C.F.R. § 404.1512(d), (e) (2001); Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (citing Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981)); Brown v. Shalala, 44 F.3d 931, 934-36 (11th Cir. 1995); Smith v. Bowen, 792 F.2d 1547, 1550-1551 (11th Cir. 1986); Caulder v. Bowen, 791 F.2d 872, 878 (11th Cir. 1986);   Todd v. Heckler, 736 F.2d 641, 642 (11th Cir. 1984). When the ALJ has not fully developed the record, remand is the appropriate remedy.  See Williams, 73 F. Supp. 2d at 1339.

Additionally, where the medical record is inadequate, additional proceedings, including additional medical tests and consultative examinations, may be needed to develop the medical evidence lacking in the record.  See 20 C.F.R. §§ 404.1517, 416.912(f); Caulder, 791 F.2d at 878; Conley v. Bowen, 781 F.2d 143 (8th Cir. 1986).  A consultative examination is not always required for the ALJ to satisfy his duty to fully and fairly develop the record; however, it may be required in order for the ALJ to render an informed decision if the record establishes that such an examination is necessary.  See Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984)(citation omitted); Pearson v. Bowen, 866 F.2d 809 (5th Cir. 1989).  It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.  See Holladay v. Bowen, 848 F.2d 1206, 1209 (11th Cir. 1988).  Prior to an ALJ's ordering a consultative examination, the claimant must first raise the "requisite suspicion" that such an examination is necessary for the ALJ to satisfy his duty of full inquiry.  See Haywood v. Sullivan, 888 F.2d 1463, 1472 (5th Cir. 1989).

Plaintiff suggests that when Plaintiff was administered a full scale I.Q. test which returned a result of 82 and was administered a WRAT test which showed Plaintiff was

12

functioning at the third grade reading level, second grade spelling level and the fifth grade arithmetic level, the ALJ should have required that a separate verbal or performance I.Q. test be performed in order to evaluate whether Plaintiff met a Listing.

A finding of disabled will be made at step three of the sequential analysis if a Plaintiff establishes that he has a diagnosis included in the Listings and has medical reports documenting that the conditions meet the specific criteria of the Listings and the durational requirements. 20 C.F.R. § 404.1525(a)-(d). Subpart 12.05 of Appendix 1 defines "mental retardation" as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Carmack v. Barnhart, 2005 WL 2108329, *2 (6th Cir. Aug. 31, 2005). A claimant will meet the listing for mental retardation only "[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria...." Id. (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A)). Criterion C requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(c)).

Plaintiff's argument that the ALJ should have ordered a verbal and performance I.Q. test despite his I.Q. score of 82 fails for several reasons. First, Randy Salmons ("Salmons"), vocational consultant, tested Plaintiff's I.Q., which resulted in a score of 82, and administered the WRAT which indicated that Plaintiff was reading on the third grade level, spelling on the second grade level and performing arithmetic on the fifth grade level.

13

(T. 379).  Salmons testified that Plaintiff's I.Q. score and grade level testing scores were consistent.  (T. 380).  "[T]he two scores were fairly correlated together.  They could have been anticipated one on the other."  (T.  380).  Further, as noted by the Commissioner, there is no record evidence that anyone ever opined that Plaintiff was mentally retarded within the period at issue.  (Dkt. 18 at p.18).  Accordingly, Plaintiff failed to meet his burden of showing that a consultative examination was necessary in order for the ALJ to make an informed decision as to whether Plaintiff met a listing under 12.05(C).

With respect to Plaintiff's use of a cane, Plaintiff argues that the ALJ never really investigated whether Plaintiff needed the cane for standing, and, if Plaintiff did need the cane for standing, two of the jobs listed by the VE would be eliminated.  Plaintiff argues that two pieces of evidence support the conclusion that Plaintiff needed the cane for standing in addition to walking: (1) Plaintiff testified that the cane helps him to avoid weight bearing on his impaired leg, and (2) Dr. Baker indicated that Plaintiff's quadriceps of the left knee were "markedly wasted," which indicated that Plaintiff was not using his left knee.  (Dkt. 16 at p.15).

The ALJ found, based on Plaintiff's symptoms alone, that he required a cane to walk. (T. 27).  The ALJ included this limitation in Plaintiff's RFC and in the hypothetical posed to the VE.  (T. 30, 529-530).  As discussed above, the ALJ discounted Plaintiff's testimony of greater impairments as not entirely credible.  Further, Dr. Baker's statement referred to his examination of Plaintiff in November 1999 before Plaintiff's alleged onset date and before Plaintiff's October 2000 surgery.  No physician ever opined that Plaintiff required a cane for standing.  Although Plaintiff complains that the ALJ never asked Plaintiff if he required a

14

cane for standing, Plaintiff's own attorney never asked him at the hearing whether he required a cane for standing.  Accordingly, the ALJ's finding that Plaintiff required a cane for walking but not for standing is supported by substantial evidence.  Further, even if the ALJ had found that Plaintiff needed to use a cane for standing and the jobs of lens inserter and final assembler were precluded, as testified to by the VE, the VE testified, and Plaintiff does not contest, that Plaintiff would still be able to perform the job of ticket checker.  (T. 530).

Accordingly, the Court finds that the ALJ did not fail to develop the record on these points.

### C.    WHETHER THE ALJ POSED A PROPER HYPOTHETICAL TO THE VE

Plaintiff argues that the ALJ failed to include the additional limitations imposed by Drs. Cherry and Baker when formulating his hypothetical.  Plaintiff also argues that the ALJ used the wrong educational description for Plaintiff in his hypothetical.  The Commissioner responds that Drs. Cherry and Baker did not opine that Plaintiff had additional limitations and any error in describing Plaintiff's mental capabilities was harmless.

In order for the VE testimony to constitute substantial evidence, the ALJ must pose a proper hypothetical that properly describes the claimant. Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002)(citing Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999), cert. denied, 529 U.S. 1089, 120 S.Ct. 1723, 146 L.Ed.2d 644 (2000)).  Here, the ALJ described Plaintiff to the VE as having a "limited education." (T. 528).  The ALJ originally asked the VE to assume that Plaintiff retained the RFC for a restricted range of sedentary work activity, providing for a maximum occasional lift of 10 pounds and a frequent lift of less

than ten pounds, restricted by the need to alternate sitting and standing, occasional use of a cane for support, and that he had a moderate concentration deficit, which would preclude all complex or detailed job tasks, but would permit simple, routine, repetitive job tasks.  (T. 529).  Upon request for clarification from the VE, the ALJ specified that the cane was needed for walking only and requested that the VE opine with respect to two scenarios: the need for the cane for walking only and the additional need for the cane when standing.  (T. 529).  The VE opined that, when the cane was required for walking only, Plaintiff could perform at least three unskilled jobs: lens inserter, ticket taker, and final assembler, all sedentary, unskilled jobs.  (T. 530).

On September 13, 2001, Dr. Cherry, a treating orthopedic surgeon, opined that Plaintiff could not "do jobs which require him to be up and walking and twisting and turning and squatting on that leg without some significant discomfort, and without some problems with stability, as far as he may fall down because of this laxity, and that's, you know, a danger to him.  So could he sit at a desk and use a keyboard, he could do lots of sedentary type work jobs.  But not what he's been doing as far as lawn care and that sort of thing."  (T. 430).  Dr. Cherry further opined that Plaintiff would not need any special type of chair or place to prop his leg.  In response to a specific questionnaire asking whether Plaintiff would be able to continue working with the restrictions of "no lifting, pushing, pulling or carrying over 15 pounds and no climbing or squatting," Dr. Cherry answered that Plaintiff would be able to work under such restrictions "if he wears his brace."  (T. 442).  The ALJ specifically referenced this record.  (T. 23).  On September 17, 2001, Dr. Baker, a one time examining orthopedic surgeon, opined that at the time of his February 12, 1999,

examination of Plaintiff, he thought Plaintiff would not be able to climb, would have difficulty stooping, crawling, and lifting over 40 pounds. (T. 454). The doctor, however, did not give Plaintiff any specific restrictions as Plaintiff was already modifying his own activity within his job.

Dr. Cherry's opinion is not inconsistent with the ALJ's finding that Plaintiff could perform sedentary work. He opined that he could perform "lots of sedentary type work jobs." Further, the Commissioner is correct that Dr. Cherry, in responding to the posed questionnaire, did not indicate that Plaintiff would be precluded from performing work beyond that which was specified. (Dkt. 18 at p.8). With respect to Dr. Baker, he saw Plaintiff in 1999 before Plaintiff's alleged onset date of disability of June 14, 2000. (T. 66). Further, his limitation of lifting no more than 40 pounds places less of a restriction on Plaintiff's abilities than the RFC found by the ALJ.

Plaintiff also argues that the ALJ erred in posing a hypothetical to the VE which included a description of Plaintiff as having a "limited education." (T. 528), Plaintiff argues that according to Salmons, Plaintiff had only a marginal education. (T. 403), Further, Plaintiff argues that Dr. Freid found Plaintiff to be functioning in the low average to below average range of general intellectual ability rather than "no less than low normal" intelligence range as found by the ALJ. (T. 305, 26). The Commissioner responds that even if the ALJ erred in describing Plaintiff's mental capabilities at the "limited education" level rather than the "marginal education" level, this error was harmless because the jobs identified by the VE all fell within the abilities of someone with only a marginal education. The Commissioner is correct.

17

A "limited education" level requires "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education." 20 C.F.R. § 404.1564(b)(3).   Marginal education is defined as "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs." Formal schooling at a 6th grade level or less is a marginal education.   20 C.F.R. § 404.1564(b)(2).  Even if the ALJ should have characterized Plaintiff's educational abilities as marginal rather than limited based on the findings of Salmons, this error was harmless. The ALJ specifically included in his hypothetical that Plaintiff could only perform simple, routine, repetitive job tasks.  The jobs listed by the VE were all unskilled positions.  (T. 530). Accordingly, the jobs that the ALJ found Plaintiff could ultimately perform fell within the description of jobs that a person with a marginal education could perform.  See Street v. Barnhart, 340 F. Supp. 2d 1289, 1294 (M.D. Ala. 2004)(finding the ALJ's error in failing to describe the Plaintiff's intellectual functioning in his hypothetical to the vocational expert was harmless where the Plaintiff's intellectual capacity exceeded that which was required by the jobs the ALJ found he could perform).

### D.   WHETHER THE ALJ SHOULD HAVE CREDITED THE VOCATIONAL CONSULTANT'S TESTIMONY OVER THE TESTIMONY OF THE VE

Finally, Plaintiff argues that the ALJ mischaracterized the testimony and report of the vocational consultant involved in Plaintiff's worker's compensation case when the ALJ found that the vocational evaluator indicated that Plaintiff "should be able to do some kind of

work." (Dkt. 16 at p. 12).   Further, Plaintiff contends that the testimony of the examining vocational consultant should have been given more weight than the testimony of the non-examining VE because the consultant based his evaluation on Plaintiff's actual performance level as recorded by his educational evaluations.  The Commissioner responds that Plaintiff has not challenged the VE's expertise and has failed to establish that the ALJ was required to accept the testimony of the vocational consultant over that of the VE.  (Dkt. 18 at 15).

The ALJ's conclusion that Plaintiff is able to perform jobs that exist in the national economy is based on the testimony of the VE.  In this case, a vocational consultant was deposed in relation to Plaintiff's worker's compensation case on September 4, 2001, and his testimony is part of the record as well.  (T. 372-407).  The ALJ noted in his opinion that after Plaintiff fell on his knee in 2001, "[a] vocational consultant later informed the worker's compensation lawyers that the claimant should be able to do some kind of work."  (T. 23).  Plaintiff is correct that this appears to be a mischaracterization of the vocational consultant's testimony.  The consultant testified that Plaintiff would have a very difficult time finding a job and has little to offer the workforce.  (T. 381).  The consultant could not identify any jobs that Plaintiff could perform.  (T. 382).  Next, the consultant opined that Plaintiff would not be able to work in response to a hypothetical situation of a 46 year old man with the educational level of third grade reading, second grade spelling and fifth grade arithmetic, the I.Q. score of 82 and the medical limitations "as he understood them."  (T. 379).

Notwithstanding the apparent mischaracterization, the real question is whether this impacted the decision of the ALJ.  The ALJ did not rely on the vocational consultant in his evaluation at step five of the sequential analysis.  As noted by the Commissioner, Plaintiff

19

has failed to put forth even one legal argument supporting a position that the consultant's testimony from September 2001 as it related to Plaintiff's worker's compensation case should have been afforded more weight than the testimony of the VE on March 21, 2002, as it specifically related to Plaintiff's application for social security benefits. (Dkt. 18 at p. 15). Plaintiff's argument that the consultant's testimony was based on the proper educational abilities of Plaintiff while the VE's was not ignores several important factors. First, the consultant based his opinion on the medical limitations "as he understood them." (T. 382). In order for a VE's testimony to constitute substantial evidence, the ALJ has to pose a hypothetical that comprises all of Plaintiff's impairments. Wilson, 284 F.3d at 1227. Here, the consultant's initial testimony was not in response to any hypothetical. Later, the consultant responded to a hypothetical that included the medical limitations "as he understood them." A response to this type of hypothetical does not constitute substantial evidence. (T. 381-82).

Further, the consultant based his opinion on his "experience and knowledge as a vocational expert, also in the workers' comp arena, I have a good understanding of the kinds of jobs that are out there. I'm on the phone with employers to determine certain occupations what the demand is for them and requirements. And I was basing it on that." (T. 387). The consultant did not specifically use any lists of jobs available in the market place, although he was familiar with such lists and had them available. (T. 388). In contrast, the VE opined that Plaintiff could perform at least three jobs that existed in significant numbers in the national economy in response to a hypothetical that adequately described Plaintiff, as discussed above. Accordingly, the Court finds that the ALJ properly

credited the testimony of the VE over the testimony of the vocational consultant hired in Plaintiff's worker's compensation case.

## IV.   CONCLUSION

In light of the above discussion, the Court finds that the ALJ's decision that Plaintiff was not under a disability was supported by substantial evidence.  Accordingly, the Court **AFFIRMS** the decision of the Commissioner and enters judgment in favor of Defendant. The CLERK is DIRECTED to enter separate judgment in favor of Defendant pursuant to Rule 58 and CLOSE the case.

DONE and ORDERED this 29th day of September 2005.

_____
MARY S. SCRIVEN
United States Magistrate Judge